Thank you, Your Honor. And good morning. My name is Miguel Estrada. I'm here on behalf of the appellants. We're asking this court for a stay of the injunction pending appeal, principally because the district court was clearly wrong on its view of injunction law. Because even if the court's view of injunction law survived the 1970s and the court's decisions in Munaf, Winter, and Ken, the district court clearly misapplied both administrative law and ignored the administrative record. And finally, because the district court also erred with respect to harm and the balance of the equities. Let me start quickly with the injunction standards, and I can move quickly to the merits after that. With respect to the injunction standards, I think the Supreme Court... We don't really have merits. This is only a motion to stay. Sure. And this is what... You have a separate merits appeal, right? Sure. Have you asked to expedite that appeal? We haven't yet. Why? Because we just got the calendar notice, and this has been proceeding so quickly, but we will be more than happy to have a motion to expedite and to brief it as quickly as the court will have us brief it. We have no objection on having the court expedite the appeal as quickly as can be expedited. On the question of the stay, we think likely to succeed because, you know, the court was applying the wrong view of induction law, having applied a out-of-date sliding scale, which I think did not survive the court's rulings in Winter and Munaf. You know, as recent as this year, we have an opinion that applied the sliding scale, the Jefferson Community Healthcare versus Jefferson Parish. I mean, the question is, how likely is likely? And, you know, the word substantial is most often used, and I think that's the better way to go. But isn't that really splitting hairs to say you need to put a fine point on how likely likely is? Judge Davis, I won't dwell on it a lot of time because I think there are so many errors on which we're likely to succeed for purposes of the stay that at the end it will not matter. To answer your question on the Jefferson Parish case, Judge Dennis' opinion on it actually stated two standards. One of them was a substantial likelihood of success on the merits, and the other one was some chance of appeal. At the end, because he held that the parish had no chance, I'm sorry, because the plaintiff had no chance of success as against the parish, it was clear that the plaintiff would meet neither standard. So anything that Judge Dennis said in that case as to the appropriate standard had to be dictum. So I don't think that the court applied either of them because the plaintiff, under the holding of the court, could meet neither of them. But ultimately, what the court said in this case seems to me is clearly inconsistent with many of the cases of this court, because at page 17 of the ruling, when the court stated, you know, the standard, the standard that was actually stated was some possibility of success short of no chance. That is at page 17 of the ruling, 4014 of the record, this court has said quite clearly that the likelihood of success on the merits actually does require more than that. Like Judge Dennis, the district court used all the standards, though, didn't she? I mean, she did also say substantially likely to prevail. Now, the problem with that aspect of the ruling, Judge Davis, is that that was in a footnote. And that brings me to the next point. Unlike Judge Dennis, a district court under Rule 65 and Rule 52 has to support an injunction with findings and reasons. And under Rule 65, even an alternative holding has to be supported with findings and so I don't think that the footnote actually saves, you know, the reasons in the injunction. But moving to the meat of the case, which I think under any standard is where the game ultimately will be in this appeal. You know, the district court really got the administrative law and the administrative record wrong in this case. And this is why we're likely to succeed on the appeal. Let me deal first with the administrative law aspect of this. The district court has focused on this court's opinion in 2007 in the O'Reilly case. And the defense... That was a merits appeal. Yes, it was a merits appeal, but she was focused on what she viewed as the failings in litigation that this court had found in that case. What the court did not actually focus in this case, and this is part of its error, is that in 2008, the EPA and the Corps of Engineers engaged in a major revamp of everything having to do with litigation. There was a major rulemaking jointly by the EPA and the Corps of Engineers in 2008, one year after the O'Reilly case. And there are two aspects of that rulemaking that are highly significant to the errors in this case. On the one hand, there was a federal statute passed in 2004 in which Congress had directed the Army to provide for regulations dealing with the question of mitigation banks and making it easier for mitigation banks to be available to solve problems with permits under Section 404 of the Clean Water Act. What is the – it seems like the problem with your situation is that there was no – there was an explanation or no explanation of why the mitigation plan was sufficient. In other words, why you can have the substitution of a certain thing for the Cypress. So we don't really understand, and it wasn't really briefed. What is your explanation? Or is there some – is there a supplemental environmental assessment in the works, in the process? No, the explanation is that all of this is taken care by the background relevant law. All of these regulations that I'm speaking of that govern the establishment of mitigation banks, on the one hand, that are heavily licensed and regulated, and also – Explain to us how the mitigation credits would be adequate. Okay. On the one hand, there is a set of regulations under which the Corps of Engineers and other adequate to address projects that may happen in this basin. Let me ask you – can I ask you a question about that? Yes, Your Honor. The other side cites 33 CFR Section 32 – 332-3C – I'm sorry, E, Subsection 2. And that says that the rationale for the required replacement ratio must be documented in the administrative record for the permit action. And you didn't cite that subsection, and I have not been able to find – maybe you can tell us where it is – where the Corps documented the substitution of the out-of-kind credits, the BLH credits, the substitution for those for the Cypress credits. Where is that documented in the administrative record? I think this is part of the Louisiana Rapid Assessment Method, Judge Owen, where the Louisiana Environmental Agencies and the EPA have developed a methodology for assessing how to figure out what will compensate for these types of permits under the regulatory structure that was established in 2008. And the LRIM very clearly sets forth that these two types of fees are considered part of the same system and support the same functions. Aren't they made it clear that this bottom land hardwood is not an in-kind substitute? It is not the same type of tree, but the key point that was missing from the Court's analysis, and what's missing here, is an unawareness of the governing law that changed in 2008. And the fundamental point here is twofold, and if I could just state it, maybe it would help clarify the District Court's misunderstanding. The approach in 2008 became what the agencies called a watershed approach, and that has two aspects. One of them is – this is from 332.3c – and at the end of Section 1, it says the ultimate goal of this approach is to improve the quality and quantity of aquatic resources within watersheds through strategic selection of compensatory mitigation sites. So you have the mitigation banks, right? And you have approved those and you have licensed them in conjunction with many other agencies. That's point one. Point two is compensatory mitigation should not focus exclusively on specific functions like a certain species, but should provide the suite of functions typically provided by the affected aquatic resource. That is to say, we do not focus on the replacement of the tree or the species. We look at the suite of resources, the functions and values that are being affected by the permittee, and we look to the mitigation bank to compensate or to replace the functions and values that are being affected by the construction project. So how would the court know it was adequate or not? Because these have been subject of comment and study by the expert agencies. On the one hand, the separate set of regulations under 332.8, which is what I mentioned first, has a very detailed structure for how you cite, how you license, how you regulate compensation mitigation banks. And these are not things that any private citizen can spring up. It's not like I am somebody who wants to open one in the Shavalaya basin and opens it. There has to be a proposal to the agencies. The agencies have to have inter-consultation with the EPA, the fisheries, and everybody else. Who's the agency? The agencies that are involved. I will give them to you in a moment. There is an inter-agency review team. This is in 332.8b2, the U.S. Environmental Protection Agency, the U.S. Fish and Wildlife Service, NOAA Fisheries and Natural Resources Conservation Service, and other federal agencies as appropriate may participate in the selection of these mitigation banks. When you get down to a particular case, 332.2b2 says the watershed approach can be used if the district engineer makes a finding that this is appropriate. I don't see anything in the EA that says he's made that finding. But what was made here was there had been a determination that there was a watershed approach by the institution of a mitigation bank, which is what the entirety of the approach calls for. And if you look at the EA, both under Section 408 and under Section 404, there is a determination that the compensation was going to be made with respect to the mitigation bank already established under the separate regulatory framework that I just described to you, 332.8. I just don't see anywhere where it explains, in this case, that the watershed approach is appropriate. I'm not talking about the global regulations. These are not really regulations. They're not approved regulations. They're guidelines, as I understand it. The regulations that we have been speaking of, Judge Davis, 332.3 and 342.8 are regulations. Under them, when these were promulgated in 2008, the Federal Register recognized that the court and other federal agencies would have to work with local agencies to develop basically the units of exchange and to figure out how to apply these things with respect to local conditions. Why isn't there provision in the regulation that, in a particular case, the district engineer must make a finding that the watershed approach is appropriate in that case? But, Judge Davis, the watershed approach is required by the regulations in every case unless something else is being applied. Well, that happened here. Yes, it happened here because we already have a pre-existing regulatory structure that already had a series of mitigation banks established under the watershed approach that was established in 2008. My issue with the district courts here is that it is requiring the Court of Engineers to explain the beginning of the world when there is an entirety of a regulatory structure that is set forth in detail in the regulations and that there is a methodology that was invoked expressly by the court in the LRIM, which explains actually expressly why it is that these two types of trees, for example, do the same functions and under the regulation that I read to you, perform the same function. Where can we find that? Where can we read that and say that these two trees will perform the same function and therefore, even though it's not in kind, it's adequate? Well, two things, Judge Owen. What I first read to you is that what the regulation calls for is, this is 332.3c, is that one should focus on the suite of functions typically provided by the effective aquatic resource. And if you then go to the local application of this, which has been put out by comment by the Court of Engineers and has been commented on by both state and federal agencies, this is the LRIM, has been commented by the Fish and Wildlife Service, by the EPA, the National Marine Fisheries, and the Louisiana Environmental Services. This is not some fly-by-night document. Let me ask you something about that. Look on page 9 of the RAM, paragraph 2, where there's a paragraph that describes mitigation kind and habitat communities. And it says that habitats that assure similar functions and services that are lost in an impact site are gained at a mitigation site. Several of the habitats described in section 1F above either provide similar wetland functions or naturally exist together as a community. And then it lists with bullet points down below the various communities. It starts with bottomwood, hardwoods, and then it lists in parentheses the communities that are considered similar to that. You won't find cypress, cupola, swamp in that list. And then the next one is ball, cypress, cupola, swamp, and there's no listed similar community. So that's the most specific thing I could find. But I think, Your Honor, if you look at actually the listing, I don't have the actual page in front of me, but I think what they say is that they do exist as a community and are grouped together. And ultimately, what we're talking about here is federal agencies, all of them that I mentioned to you in the exercise of administrative expertise. And the questions are really twofold, whether they have to express all of this in high verba every time they do an EA, which is supposed to be an informal document, and whether they have to sort of cross every one of these fees, or whether the exercise of expertise that have been expressed in these areas, where they already have basically a chart that tells you how, in their view, the functions and values are equivalent. This is an exercise of expertise. Well, I saw the chart, but I don't see any explanation to how that chart was applied to this case. No, they do say they utilize the LRIM. And if you go further into the LRIM, what it tells you is they start with an assessment of the current quality of the wetland and see whether it's in good condition, bad condition, sort of indifferent. And then you see what sort of impact the work is going to have. And they end up using all of these numbers. They give numbers from one to three to these various characteristics. And at the end of the process, they come up with a number in acres as to what it is that has to be mitigated. Now, it is a process that is explained in the LRIM. It is a process that, again, the agencies understand. This is why we have expert agencies. They put it out for comment to the public and to other agencies. They told the entire world that they used it here. They had a chart in the EA explaining how they applied it here. I see the chart, and it lists factors that they consider. But it doesn't explain, so I can understand it anyway, how they applied that chart to the factors in this case. I mean, in the EA, it goes on for pages and pages about the effects on the cypress swamp. But it doesn't explain how substituting these bottomland hardwoods mitigate that. Again, Judge Davis, let me say again that what the regulations require is for the agency to express an expert judgment on whether the impact on the values and functions of the aquatic resource is being mitigated. Not in the words of the reg that I read you, whether the specific species is being replaced. That is what the regulations say, and this is why the dual approach that the 2000 regulations approach makes sense. They are looking to the preservation of aquatic resources. This is, after all, the Clean Water Act, not the Clean Cypress Act. They are looking to the preservation of aquatic resources as an ecosystem. They're not looking at a specific species. Well, I understand that, but the EA goes on and on about the impact to the cypress swamp that they're crossing without any explanation for how the bottomland hardwoods mitigate that. Again, Judge Davis, if these were questions that had been confined to the federal jurisdiction of the federal district courts, we could have a very nice discussion as to whether there is a record and whether witnesses actually testified. Well, why can't this question be answered by a supplemental EA? This is a question we have, all right? So it's not adequately explained. That is my next question, Your Honor. I mean, even under the view that a federal court must be able to follow every dot and tittle of the analysis of the agency as opposed to, as the administrative law principles usually say. Well, I hope that's not the case. Well, as opposed to the administrative law principles that usually apply, which is a question of deference to the judgment of the agencies. But we don't have to say, but it can't be the rule that you can come up with a black box decision and just say, trust me, and that's adequate. But it isn't the rule, and I'm not urging the rule, Judge Davis. But keep in mind, again, that we have hundreds of pages of two EAs in this case with charts and a methodology. And if I had all the time in the world, I could read you ad nauseam the Federal Register explanation as to why the Court of Engineers and the EPA chose to do it this way instead of looking at each tree and not using mitigation banks. I don't suggest that, but it does look to me like they've looked at the facts of this case. I mean, you've got regulations that govern things across the board, but nobody is the one that's looked at this case. Judge Davis, you know, I think it is very clear from both of the EAs, not only that the court analyzed all of the claims in this case, but that in addition, the businesses decide and consider all of the claims. But where do they say in the EA how the bottom lines are going to mitigate all the harm that they cover in exhausting detail is going to happen to the basin? What they said actually is that there was going to be a loss of function of 142 acres. They didn't say that there was going to be exhausting harm. Well, they go on and on about the harm to the aquatic... Yes. Yes, it is harm, but this is, again... I thought it was not even disputed that there is a harm. Well, of course, this is why we paid $20 million plus in a mitigation bank. But this is why the structure that Congress and the agency established was to say, we're going to provide for these infrastructure projects by having a system whereby people who are already specialized in these things will make sure that there is no overall diminishment of wetland value. If I could go back to the point that Judge Clement was raising, which I think is a very important one, even if you were the law, that federal judges must follow every judgment in the analysis of the agency, and that there were an error that called for the agency to further explain itself, it does not follow that an injunction of the pipeline has to issue. Even O'Reilly said that. The court in O'Reilly said that one possible outcome is for there to be a remand without the pipeline being actually enjoined, right? Because as often happens, and this happens in the D.C. case, when ultimately, after all the litigation, there was a minor defect on NEPA that was found with respect to some treaty rights. There was a remand to the agency. The pipeline was not enjoined. The pipeline continued to run. And usually... I want to ask you if there was a revision. What is the status of a revision in the event that it is remanded to the district court for additional explanation, which seems to be the... Keep in mind that that has not been the disposition from the district court. The district court has enjoined everything. If this court were to say that that's overbroad, and that there was no injunction, and that the appropriate remedy... Well, we can't say that. We can only say you don't get a stay, or you do get a stay. Let me ask you two questions. You're way over your time, but we'll give additional time to your opposing counsel. What's the status of the high water? Is it preventing construction? Only at the levees. I think there has been a misunderstanding on the part of my opponents as to what the permits say. There are two permits here, the 408 permit and the 404 permit. Condition N of the 408 permit that deals with the crossing of federal rivers and the facilities is the rivers and harvest permit. Says that with respect to the area that is adjacent to the levees, if the water rises above 11 feet, we cannot basically have open ditches. We don't want to topple the levees, basically. Is that the status now? That is the status at the levees, but there are like 20 plus miles in between where construction, if the injunction were lifted, could be ongoing. And that's affected not by the 408 permit, but mostly by the 404 permit. To be sure, as we wait longer and longer, waters will rise, and it will become a question of safety and danger. What time period? I mean, I think, you know, time is of the essence. This is what we had... Days? Weeks? No, I think weeks. But, you know, we need to... Complete the project if there was no injunction within weeks? Well, we have, I mean, I don't know technically the answer to that. I think we are hoping that we can make up, you know, the lost time in the basin. We have, as we explained in the supplemental affidavits, we had separate crews working in other parts of the pipeline outside of the basin. And so we could try to make up, you know, some of the lost time. And as we said in the affidavits, we had built in a little bit of extra time to take into account of, you know, the vagaries of the weather in the basin. So our hope is yes, but obviously, time is of the essence. My other question is, I went to Alaska and saw this major pipeline. It was elevated. Why can't you elevate the pipeline over this particular cross-fish, cypress tree area? Well, I think that would raise a different environmental objection. I think part of the major objection that has been raised is that the elevation of dirt and other aspects of infrastructure, in fact, tends to impede currents from north to south in the basin. Right, but the dirt comes from the hole you're digging to put the pipeline in. If the pipeline was elevated for this critical area, would that be objectionable? I don't know that that has ever been considered as an alternative, and I don't know what the feasibility technically of it would be. Okay. This pipeline started in Lake Charles? Yes, I think that's right. Is it completed up to the basin, or? No, I think the plan is to have simultaneous construction ongoing in all parts of it, Your Honor.  Thank you, Your Honor. Good morning. May it please the Court. My name is Jan Hasselman on behalf of the Environmental and Commercial Cross-Fishing Group plaintiffs. Granting this stay will result in significant environmental damage to the basin. It could also mean that this appeal would be moved before it could be heard, because most of the damage that we're trying to prevent could be complete before we get there. And on the other side of the equation, granting the stay will not get this project completed any faster, and that's because of the flood situation. They will not be able to finish the project on their preferred schedule with or without a stay. Well, they said they can work for four or five weeks before it gets critical. Well, a pipeline that is 99 percent complete still generates zero revenue. So we have an affidavit from our expert that says the water is already high. It's not coming down until the end of August or later. We're in a... Then you don't need an injunction, do you, if they can't do the work? No, that's not right, because they will continue the work in the basin, clearing the trees and digging the dishes. Now, there's a question about this. Do you do that with high water? That's a technical question. In terms of the permit, they are prohibited from completing the project in a couple of places now. The test, what you just heard, was that it only applies to the leadens. That isn't correct. The 408 permit applies more broadly than that, and I can get you a record site on that. It applies to four different projects within the basin as well as roughly 10 percent of the land within the basin. That's a record 1565. That's the permit that says what the project, the 408 permit covers. The core says that's about 10 percent, and I'll give you another record at 4355. So, we have a briefing schedule already that's going quickly. The briefing will be complete by May. We have time to address the pretty weighty issues that are involved in this appeal in the normal course of an appellate schedule rather than an emergency stay motion with rushed briefing and a rushed schedule. I know there's not a merits appeal, but what are you seeking? Are you seeking damages or litigation costs? No, no, this is a case about damages. This is a case about the adequacy of the permits. I mean, everybody says there aren't enough cypress to below credits available. You agree to that. Everybody agrees to that. So, what are these people supposed to do? How can they proceed with their pipeline? Well, at the very fundamental point here is that a project like this, a major crude oil pipeline crossing a place of unique sensitivity, cultural and ecological sensitivity, is significant. It requires a full environmental impact statement, and that involves a consideration of alternatives. What's the alternative? An elevated pipeline? Well, you… From the designated course? That would be an alternative, yeah. What would that cost? Well, I don't know, but… You're asking for it. Well, the Clean Water Act… You know, NEPA sets up a system where they look at alternatives. They examine the pros and cons. It's a process. The Clean Water Act is substantive. At the end of the day, if a permit's not in the public interest, if the balancing of pros and cons of the project doesn't pencil out in a positive way, then the permit has to be denied. So… I thought they did consider quite a few alternatives and concluded that they were not feasible. I'm sorry, Judge Owen. I didn't hear that. I thought that they did, in writing, consider a number of alternatives. Trucking… I forgot all the alternatives they considered, but I thought they did consider all the alternatives. That's right. Within the context of an environmental assessment, an environmental assessment documents and supports the agency's reasoning that there are no significant impacts that warrant a full EIS. So, again, we think the impacts are significant. That would trigger an EIS and a more robust consideration of all the impacts, which includes the mitigation. Are there other mitigation options besides out-of-basin credits – or, I'm sorry, out-of-kind credits that have very little ecological relationship to the area being harmed? Did you write these arguments with the Corps? And if so, what was their response? I'm sorry, I'm going to have to ask you to repeat that again. Did you raise these arguments with the Corps? And if so, what was their response? We absolutely did raise all these arguments with the Army Corps. We asked that a full EIS be completed for the project. We asked that the permit be denied under their Clean Water Act authority. We asked that they consider alternative mitigation. They reached a conclusion that there were no significant impacts, and they came up with a mitigation option, as you heard at length here, where there was very little – or no analysis documenting the relationship between the impact and the mitigation. What other alternatives did you suggest in your comments? Did you suggest others? Well, we asked that the permit be denied. That's a big one. The EIS would be – have been the process to really flesh out the alternatives. But I mean, under the EA's scope, did you suggest any other alternatives? Not beyond what I've mentioned. I mean, the thing about the EA is the EA is not released for public comment. It is a – essentially, the Army Corps announces that they're considering a permit. But you do have an opportunity to comment when they announce that they're going to build a pipeline. Sure. There's a page that says there will be a pipeline. Here's where it's going to be resubmitted. Lots of comments. My clients, many others, elected officials, state agencies. Yeah. What are you asking for? I mean, what do you want them to do? If you're not satisfied with the credits that they've purchased and deposited or whatever you do with them, I mean, they're not – the pipeline has to be finished at some point. So backing up, what we want is to deny this – for you to deny the stay in this emergency situation, we can have an appeal on the – I know that's what you want in the litigation, but what do you want the pipeline construction  We want this permit to be denied. There's a history of treating this special and unique place that holds all sorts of – What would be the alternative if the permit was denied? How would they finish their pipeline? I don't know that that's our job, to come up with that technical – that part of the technical – You could ask for relief, whatever the relief is, to avoid what they're doing now. I don't see a practical solution to this. What do you mean, relief? Relief. If you win the lawsuit, you get relief. You win. If we win the lawsuit, I think the remedy is it goes back to the Army Corps. They have to do a supplemental analysis, either through a revised EA or through a full EIS, and the process starts over. The process is – And they do that and they come up with an explanation as to why these credits are adequate. Well, then we'll deal with it at that time. Okay, but that's what you're asking for. You're asking for a supplemental redo, right? That's all we can ask for under administrative law. Right. But there are alternatives that could come out of that process that don't involve permanent and irreparable damage. All right, what are the alternatives? That's what Judge Davis asked you. Well, that's – now I kind of feel like I'm going in circles. That's what the process is supposed to elucidate. What process?  The supplemental? Yeah, that's what would come out of a lawsuit. So I want to come back a little bit to where we are with this proceeding, which is emergency stay motion. It's an extraordinary remedy, and the reason that is is because it's the trial court that has the job and the discretion of weighing the evidence and testing the credibility of the witnesses and balancing the equities. And it's a function that this court and the Supreme Court have said deserves respect, and the district court undertook that function with particular care. There was a full-day hearing of facts and expert witnesses. The district court gave every party the opportunity to be fully heard. We spent half a day in oral argument. The district court spent two weeks crafting an opinion, even though there was ongoing damage. I think it's notable that the Army Corps, who is the entity in charge of defending this permit, hasn't appealed the injunction, hasn't joined this motion for a stay. I'd like to talk, if I can, a little bit about the harm, because there have been some issues raised in the briefing about the environmental harm, and I do want to talk about the mitigation legal issues as well. But the flood situation is a very relevant context for this motion. I read that next week the river is cresting at one of the highest levels ever. High water is not weeks or a month away, it's here. And that is important for a couple different reasons. There was extensive testimony before the district court about how cutting this channel through the basin would carry and distribute sediment throughout the basin, which had a variety of serious ecological effects. And one of those effects, as the district court heard, was the inability of the basin to sustain the livelihoods of my clients as commercial crawfishermen. In his district court testimony, our expert, Dr. Van Heerden, explained how this is harmful any time of year, but particularly harmful during times of high water, because the capacity of the basin is so much higher to carry sediment. Well, the Corps acknowledged most of that, didn't it? Uh, well, the question of irreparable harm is a factual finding at the district court level. So there was, you know, we put out evidence of harm, as is our burden. The Army Corps did not put out any evidence of harm. I'm talking about in the EA. They list a considerable amount of harm. Yeah, they acknowledged that this is a very significant project that would have cumulatively significant impacts. Well, particularly during crawfish season, right? Well, I think it's particularly during times of high water when it would increase... Well, that's the same time frame. Okay. But it's permanent. We have crawfish every spring. We have crawfish every spring. We have high water every spring. Right. And in the spring, right now, the river is carrying six times as much water as it does during low season. That's six times as much sediment pouring into the basin where it will cause all these ecological effects. So if there is a time of year when proceeding with this injunction is at its highest, it's right now. Well, they argue in their brief that they can't do anything now, not even remediation, to fix some of the levees that would keep some of this harm from happening. Shouldn't we at least modify the injunction at a minimum to do that? Well, yeah. If there's an issue of modifying the injunction to backfill in the one mile of trench that's been dug, that can be raised with the district court. We would stipulate to that, of course. We haven't been approached about that. They're not here to modify the injunction. Is that a stipulation you would agree to it? I think so. I think I need to talk to my clients, but I think there's a question about working now during a time of high water, what the pros and cons of that are. And so I would want to consult with our experts on that before I sit up here and agree to that. But I don't think that's something that you need to get involved with. And it's not what you're being asked to do. You're being asked to stay the injunction, which would allow them to clear this 75 foot wide channel to the basin in the next month or two. So, if the standard is abuse of discretion, the district court heard the testimony, weighed the credibility of the experts, everyone had an opportunity, and the district court made this finding of irreparable harm. And you've been given nothing that would lead you to disturb that finding. There is also a certain irreparable harm to the destruction of these unique cypress wetlands. There's a question that was raised about the scope of that, and I want to address this quickly. You know, to me, I didn't see a lot of opposition to the argument that there's irreparable harm. I mean, the EA seems to lay that out. But what I see is the real issue is whether the mitigation is appropriate. So, talk about that. Sure, I'll move off of harm. I do want to talk about their harm. But if there's going to be irreparable harm from a stay, I think it means the stay needs to be denied. So, let's talk about mitigation. So, I think the core issue is the Army Corps allowing the destruction of 600 acres of Cypress Tupelo Swamp in exchange for the mitigation bank credits, which are planting trees in a former cotton field. That is not and will never be a cypress swamp. There are no crawfish there. There are no bird mercuries. There are no recreational opportunities. It's 55 miles away from the right-of-way in a completely different kind of ecosystem. So, we argued to the district court that that was inconsistent with the governing regulations, and the district court agreed. Well, you wanted them to replant cypress trees in the basin rather than the bottom land hardwood trees? So, again, you don't have to come in to be denied, because we can't mitigate. All right, I want to ask you, when this was happening in the Corps, did you raise these issues with the Corps that you just mentioned? If it's 55 miles away, the recreational opportunities will be lost, all of that. Did you raise that with the Corps? And if so, what was their response? We raised that to the best of our ability. The problem with the way this happened in an administrative level was that the Army Corps didn't provide any public notice of where the mitigation credits were. They said, we are going to mitigate with credits somewhere in the Louisiana district. So, we were somewhat handicapped in our responses. We nonetheless, as the district court found, submitted comments about why credits in different places don't work. We actually made a claim to the district court that the process, that the notice on mitigation was insufficient because of this. The district court rejected that part of our claim, finding that we, you know, our comments demonstrated that we had enough information to comment usefully. All right, so to answer my question, what would you want? What did you argue, or what are you arguing now? If the trees being planted in a different area isn't adequate, are you saying they should plant cypress trees somewhere? No, we offered an alternative mitigation approach during the comment period. And that's not because that was our sole goal, but it was a recognition that ultimately the permit was likely to be granted. And the mitigation that we proposed was removal of existing spoil banks in the right-of-way. So, in the right-of-way of this pipeline is a spoil bank, and that's clear from our briefing. I won't explain what it is. Your opponent says, this belongs to somebody else, and we can't go on that property and do that. Well, they can stand up and say that here. That wasn't part of the administrative process. There wasn't a discussion of that alternative in the process. Instead, there was a reflective decision to use mitigation bank credits. Well, that is given as the first alternative, isn't it? If they are the right resource type, and bottomland hardwoods in a cotton field 55 miles away are not the right resource type. Well, they say that under the LRAM, with that formula, the regulations provide the answer. So, what do you say to that? So, let me say a word about LRAM. I think it's notable that the Army Corps, which is the agency defending this decision, did not say one word about LRAM in its brief during the hearing or in its post-hearing brief. It never came up. They have submitted a document that you had a discussion with the council about that was not part of the record below. It was never submitted to the district court. So, it's not an abuse of discretion for the district court to fail to consider a document that no one ever submitted or an argument that nobody ever made. So, we have a post hoc argument going on here with respect to LRAM. Now, in your question, Your Honor, you correctly identified me at that spot in the process where they go wrong with their proposal, which is page 9, which groups together the six different kinds of ecosystems in the district. Their argument is that all of those are in kind to one another. That's not what the document says. Those are different categories of documents that are in kind among themselves. Coastal prairie is not in kind to bottom land habitats. That's just not what the document says. So, again, the question… Yeah, but they then go to the LRAM. I beg your pardon? They go from that point to the LRAM and say the regulations provide the answer. Well, that document is the LRAM. Well, look further in the LRAM where they have the formula. Well, I think it was, again, you, Your Honor, that correctly honed in on the right regulation, which is 332.3e2, that sets a very high bar for out-of-kind mitigation. There just isn't any dispute. This is out-of-kind mitigation, okay? It's not cypress swamp. It's something different. All right. Did you tell the Corps that you can't substitute hard… the beaten credits that they allowed for the cypress credit? Did you raise that with the Corps? Again, Your Honor, to the best of our ability, but we didn't have any notice at any time that this was the plan. The first that anybody ever heard of the mitigation proposal was when the decision was made and the environmental analysis released. However, we did, in our comments, highlight the need to mitigate appropriately consistent with the regulations. And what did the Corps respond? They made their decision. You know, they acknowledged the existence of comments. And the way the EA has set out is it sort of recites the comments, so it acknowledged the fact that we commented, and then it made its decision. It said, you know, we're mitigating. There aren't any more cypress Tupelo credits, and so we're mitigating out-of-kind. That was the extent of the explanation. Well, this is out-of-fact. There are no cypress credits remaining. I assume that to be a fact. It doesn't mean they can violate the regulations. You know, again… What's the violation? The regulations allow exactly what you were discussing with counsel. There is no discussion about the relationship between the mitigation proposed and the decision made. The regulations allow it. No explanation, you mean. It's just a conclusion. Exactly, yeah. The regulations allow it, but they set a very high bar. Out-of-kind mitigation is not preferred, and it doesn't matter whether it's a mitigation bank credit or anything else. It's a very high bar, and the regs specifically call out, you know, unique and hard-to-replace resources as an even higher bar. So they need to do more to either identify opportunities for in-time, which, you know, we had a suggestion. I don't know if it works or not because it was never examined, the restoration in the right-of-way, but that would have provided a pretty significant environmental benefit. Ironically, it's a benefit that arises from getting rid of, you know, harm that someone else completed a long time ago, but nonetheless, it would have provided a benefit. An EIS would provide the opportunity to really dig in. If it is technically infeasible, well, okay, they can examine that and subject that to the full light of an easy review and several comments, but none of that happens here. I want to, before I run out of time, I do want to talk a little bit about harm on the other side of the equation because they're not entitled to a stay without a showing of irreparable harm. And, you know, we said before, and we'll say again, you know, we don't doubt that there are economic consequences to this injunction, and we don't take them lightly. I represent commercial crawfishing, and my client's livelihoods are on the line here, and so we respect that. The bond was only $10,000, right? That doesn't go far. Is that correct? That's correct. So why is the bond so low if they've got irreparable financial losses? Well, the bond isn't set, you know, depending on their claim of every theoretical loss. The bond represents a discretionary balance from either district court of all of the different injunction factors, the likelihood of success, the level of harm, the party's ability to pay. This circuit is upheld, district court setting no bond at all. So the district court came up with a reasonable bond. It's meaningful for my clients. What's meaningful because it's low? Well, it's meaningful because it's not that easy for my clients to pay. You know, three of the groups I represent are very small, grassroots, non-profit organizations and a trade association. You know, the district court weighed the factors and came up with a decision. That's a pretty discretionary decision within the trial court. Are you seeking attorney's fees? If we prevail on the merits, we will seek attorney's fees against federal government. So with respect to their harm, I want to come back to their ability to complete the project. And we talked about the fact that the 408 permit applies more broadly than they suggested applies in a couple – in about 10 percent of the basin. And, you know, the company's own lawyer told the district court that they had to stop construction in a high-water event. This is what he said. In fact, your own 408 permit, it says that if there is, in fact, a high-water event that occurs during construction, we have to stop construction. That's at record 4303. So the water's not coming down any time soon. They're not going to be able to complete the project. Again, you know, a project that is almost but not quite complete doesn't generate any revenue. So the testimony about lost revenues, I think, misses the mark. We're already past that point anyway because of the flood. Well, if they can't do the work, they don't need to be enjoined. I want to come back to that because that's not right. If the 408 permit only covers 10 percent of the basin, that means they could do the clearing in the other 90 percent of the basin. You know, the injunction was rendered on the 404 permit. Is that right? That's right. So they can work between the levies but not beyond that, right? They can't go over the levies. Under the injunction, that's right. I understand the injunction is a levy to levy. And the 408 permit would only prohibit them from... The 408? The 408 is the other permit. There's two permits, the 404 and the 408. The 408 permit has this condition that we were talking about previously that says if the water's above 11 feet, we're now at 17 feet, the water's above 11 feet, you have to stop construction and backfill in the trenches. Where is the water? I know the Mississippi River is at 17. Is that what we're talking about? Yeah, that's the gauge. The permit has a limit that says if it goes above 11 feet, it's a keratin gauge. It's actually five days before it hits that limit. That limit was hit the day before the injunction was issued. The district court gave them the opportunity, or the district court found that they had failed to put in sufficient evidence to justify the very vast amounts of harm that they alleged. They gave them the full opportunity to be heard. They introduced some evidence. The court didn't find it very compelling. Again, that is within the special problems of the district court to make that finding. It's not an abuse of discretion. I don't think they've solved that problem with their additional filings in this motion. All of the harm that they alleged is speculative or contingent. It is hedged with language like may or potentially – for example, they lumped together a daily standby cost of keeping the crews active with a demobilization cost. Because I read that contract. If the crew is demobilized, they don't also have to pay the standby cost. So they need to be clear about what the actual daily impact is if the stay is denied and the appeal goes forward on a normal schedule. Unless you have additional questions, I don't have more.  Thank you. Thank you. Let's go to Strada. Opposing counsel referred to a document he said has been presented but it was not presented or argued to the district court. Is that correct? For the LRAM? I'm quite surprised. I think what he said was that the government has never used it and was never mentioned to the district court. I was quite surprised to hear that because it is expressly invoked at page 65 of the Rule 404 EA where the court expressly says the Louisiana Wetland Rapid Assessment Method was utilized to determine the credits. And then it goes on for several pages telling you which of the mitigation banks got which  I think counsel said that the party, your client, you did not introduce the LRAM in the district court. I actually looked for a reference to it, a page reference. Well, I don't think that is something that needs to be introduced in evidence because it is a public record of the government. It's sort of published on the government website. This is the methodology that they use and it's on the government. It is on the Corps of Engineers website, has been published by them, subject to comment by them and other government agencies. If you look it up, you know, the website is actually cited in her brief. Did you argue that to the district court? Well, I don't think she entertained argument that any of these things, nor did she gave us any inkling. I mean, if I briefed, so was it briefed? I don't recall whether this point had arisen because I don't know that they had raised this point. Keep in mind that until this ruling issued, their favorite mitigation was we had to use our equipment while we were constructing the pipeline to remove the piles that were left by other people. And one of the astounding parts of this case is that we have a series of claims under which an injunction was granted that are contradictory to what they argued in the administrative record. If you look, I believe, at page 15 of the EA in the 404 ruling, what they were asking the court to do was to order as mitigation that we, while we were building the pipeline and our equipment was there, this is on page 15, that we use the opportunity after we clear the trees, of course, and building the pipeline, to remove the piles of dirt that other people left. That of course is inconsistent with the entire case here. I thought the core of the district court's opinion was that the mitigation suggested by the EA was not appropriate. And that's, I mean, I thought that invoked, that's why it invoked your LRAM argument and all the formula and so forth. Well, to be sure, but I think part of the error is that she completely ignored the fact that it was a methodology that was expressly invoked in the EA that had been vetted by the court with other government agencies and that was invoked and incorporated by reference into the EA. I don't believe that there is any principle of administrative law that says the court of engineers has to set up in high verba a methodology that it has published in its website that it invoked in the EA and then applied in a number of charts in the EA. It might have been helpful to the district court, though, if you had argued what you argued to us. Again, Judge Davis, until this judgment issued, I don't think we had any reason to expect that she was going to overlook something that was stated in high verba in the EA. Second point, which I think is sort of important not to lose sight of here because, you know, there were references to irreparable harm. The statutes at issue here are two, NEPA, which is solely about process, and the Clean Water Act, which is about the preservation of aquatic resources. There is no statute at issue here like the Endangered Species Act or any other statute that protects the antiquity of cypress trees or any other trees. There is no statute that protects the antiquity of trees as such. We have regulations that deal with mitigation banks and mitigation credits and the hierarchy that were expressly promulgated under the Clean Water Act by two federal agencies and that say that when the court determines that the loss of aquatic resources is unavoidable, as indisputably happened here, the court may determine that a mitigation bank properly established previously in accordance with law may be used to offset that loss of aquatic life. That's what the court did here in accordance with the methodology previously published that was explained in the EA. Finally, even the district court did not credit this notion that they didn't have notice of what a mitigation would be used. And the reason for that is simple. As I started out by saying, this whole notion of mitigation banks has been in the works since 2008. They are established pursuant to regulations. There is one that has been designated for this basin. This is where we went to get these credits. Whether it is 50 miles away or two miles away, the relevant federal agencies have designated this bank as the relevant depository to counteract the effects of infrastructure projects such as this one. What happened at this hearing over the repeated objections of us and of the government attorneys was that Mr. Hasselman introduced a number of witnesses that basically, under the guise of irreparable harm, introduced evidence intended to contradict the conclusion of the administrative record and the relevant law. They came at a time, and this may have been the only objection that the district court finally sustained, where one of his witnesses said, this whole concept of a mitigation bank is ludicrous. It's like balancing your checkbook without taking into account your grocery bill. So it was a cavalcade of punitive experts, the sole purpose of which, under the guise of irreparable harm, was to come up with an alternative admin record and an alternative version of the law. But the fact is, from the get-go, the relevant public knew that there were mitigation banks that had been subject to notice and comment. There was one designated for this reason. There was no mystery as to where that bank was, that it was 55 miles away from the project. There was no mystery as to what the methodology that the EPA and the court and other state agencies had in mind. It was a mystery to me. It was a mystery to me. When I look at the LRAM and I see Ball Cypress and no other environmental community listed after it as an appropriate grouping to go with Ball Cypress, I mean, that's the most definitive thing I see in the LRAM. If I could finish with that point, David, because I know the court has been very indulgent with our time today. At page 9 of the LRAM, and this goes on for pages with an actual methodology, it does list a number of the species, including bottomline hardwoods. This is page 9. And it says the court of engineers will consider the following as a list of habitats that will be grouped together. Bottomline hardwoods is first on the list. Ball Cypress, Pippalus swamp is second. And the reason it is on page 9 is that they provide similar width and function. No, but what it says is the ones that follow bottomline hardwoods in parentheses are the ones that's grouped with bottomline hardwoods. But Ball Cypress is not in parentheses after bottomline hardwoods. No, but what follows the colon is a whole list of bottomline hardwoods, Ball Cypress, Pippalus swamp, pine plantwoods, coastal prairies, fresh intermediate marsh, and brackish saline marsh is a list. It's not merely what's in the parentheses. And so Cypress and Pippalus is part of the same list of what is grouped together in bullet points. Yeah, but you see the example it gives above? It says several of the habitats described in section 1F1 above either provide similar wetland functions or naturally exist together as a community. Parentheses, i.e., pinewoods, baywood swamps, pine savings exist together as a pinewood savanna community. And that's, and you see it listed below, and so they refer to the ones that are listed in the parentheses as being grouped together with the one that has the bullet point heading. I mean, I suppose that's a possible reading of that, but I think it's inconsistent with the column bullet points. Having said all of that, I will go back to the point that I started with, which is that what the regulation says expressly is that in considering the loss of aquatic function, you do not focus on the loss of a particular species. You consider on the functions and values and the replacement of the loss of aquatic function. That's what 332.3c says, and this is why we have the mitigation bands. At the end of the day, the question here is whether the expert agencies here can be allowed to determine that a mitigation band established in accordance with law, previously subject to notice and comment, and that has already been vetted by a number of agencies and considered adequate to satisfy the needs of this basin, was properly found by the expert agencies here to be adequate to satisfy the impact that were found for this project. And one can disagree with the expert agencies, but if you well know, the law is that there's not a good enough reason to enjoin them. Tom, let me ask you this. If I had used coastal credit as opposed to the hardwood, would the answer be the same, the coastal prairie? I mean, that seems to me very different from the cypress swamp or the hardwood. Judge Owen, I cannot pretend to have any expertise on plants. If I had any talent for anything other than this, I wouldn't be a lawyer. I honestly don't know. Under your reading of it, like brackish saline marsh would be a substitute. No, I understand the point, and it is possible that that's an alternative reading, but at the end of the day, Judge Davis and Judge Owen, I think the important point is that what is clear from the EA is that the court determined that they provided similar aquatic functions enough to be grouped in the mitigation bank that had previously been established and to be allowed to be substituted here for the 142 acres that the court found would be permanently impacted. Not 300, not 600, 142. And having made that finding and having explained it in the EA, the court discharged all that it was required to do. One final word on the court. They are not here because obviously they are not building a pipeline. We are the people who are building the pipeline and are impacted by the injunction. The government, as the court knows, has until the end of time to even file an article of appeal. They appeared in this report and made the same point I'm making here. They made the same point about winter and the science scale, and they made the same points that we made here on the merits. They said that they had no dubbing to decide as to whether the pipeline gets built or not, but they did work, but they were in court to defend their permit and their reasoning, and that's what they did. They objected to the punitive experts that Mr. Hasselman tried to put in as trying to circumvent the administrative record, and they made essentially the same arguments that we're making here today, including, you know, the fact that they did consider all of the environmental effects in both of the EAs, and that they adequately considered mitigation back in accordance with the regulation. So I don't think that there is any air in between them and us, except that they're not impacted by the injunction, and we are, as immediately. All right. So if the court needs a further explanation of why the mitigation plan addresses the harm that has already been established that will occur from the project, who would do that? If it was remanded, would the court do that? Would you do that? Well, I think what would have been appropriate if the court correctly had found an error in the court's work, what would have been appropriate would be a remand to the court rather than an injunction, without an injunction. District court remand. As the district court did in the Dakota Access case, where... The Dakota party in that case. The court is in a... Yes. You know, both in the Dakota Access case, the court of engineers is always sued, and we intervene. That's what happened in front of Judge Goldsberg. Why should the work go forward until a satisfactory explanation is made? Because usually the rule of administrative law, Judge Davis, and there are like tons of cases of this in the D.C. Circuit, including one leading case called Allied Signal, is that when you have found a defect in an agency's work that is in absence of explanation rather than something more severe, there is no reason to think that the agency, when prompted, will furnish the requisite explanation, which is different from some other parts, from some other types of administrative errors. And so the general rule in the circuit that here is the bulk of administrative law appeals, the D.C. Circuit, is that you usually remand without vacating the administrative agency's action because you do not sort of expect that the agency will fail to explain its action if that's all that is missing. And that's what Judge Goldsberg did in the Dakota Access case. That wasn't what the panel did in O'Reilly, though. That's not what the panel did in O'Reilly. That's correct. I mean, I don't see how, until you're satisfied that appropriate mitigation banks are going to be offered, I don't know how the builder could evaluate whether he can do it or not, or whether the court should allow it to go on. I mean, I don't know. That would be like a really core problem. Judge Davis, that depends on what your conception is of what's missing. If what's missing is the joining of the dots, I think you might be right. As I pointed out earlier, and this is sort of, you know, beyond the scope of this, you know, the scope of these appeals, I think it has a judge who consistently takes your view. I think that's Judge Ray Randolph. You know, the majority of the court takes, you know, the opposite view that the appropriate remedy, when a court finds that an agency has failed to properly explain something, is a remand without dictating or enjoining. But what if the court on remand would find that there really is no appropriate mitigation bank available? So we're going to have to go to one of those lower ones, like the permittees, making improvements on the property. I think it's reasonably clear, Judge Davis, if you were thinking that it was reasonably likely on a remand that the court was going to find that this was really a major action that was impacting the environment and that an EIS was really going to be needed, which I think is beyond the realm of likelihood and comprehension based on what the agency has done here. Maybe your view would carry the day. But if all that the plaintiff really has to say is that they are not satisfied that the agency has crossed every T and dotted every I, it seems to me that that's the quintessential case for a remand for unexplanation. A remand with a deadline? Yes. A short deadline? Yes. Okay. Thank you, Your Honor. Thank you. That's the last and only case we have on the docket, so we'll be at recess. Thank you, Your Honor. Thank you.